IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TRITEQ LOCK & SECURITY, LLC, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 4:26-cv-8559 |
| | § | |
| IMBERA USA, LLC | § | |
| Defendant. | § | **JURY TRIAL DEMANDED** |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff TRITEQ LOCK & SECURITY, LLC files this Complaint for Patent Infringement against Defendant IMBERA USA, LLC, alleging as follows:

## I. THE PARTIES

1. TRITEQ LOCK & SECURITY, LLC ("Plaintiff" or "Triteq") is a limited liability company organized and existing under the laws of the State of Illinois, with a principal place of business at 701 Gullo Road, Elk Grove, Illinois 60007.

2. Defendant IMBERA USA, LLC is a limited liability company organized and existing under the State of Texas, having a principal place of business at 1925 Shiloh Road NW, Kennesaw, GA 30144. IMBERA USA, LLC may be served through its registered agent Corporation Service Company d/b/a CSC – Lawyers INCO at 211 E. 7th Street, Suite 620, Austin, TX 78701.

## II. JURISDICTION AND VENUE

3. This is an action for infringement of United States patents under 35 U.S.C. §§ 271, *et seq.* Federal question jurisdiction is conferred to this Court over patent infringement actions under 28 U.S.C. §§ 1331 and 1338(a).

4. Defendant IMBERA USA, LLC is organized under the laws of the State of Texas and, therefore, resides within this State. IMBERA USA, LLC maintains a regular and established place of business within this District at 1293 N. Post Oak Road, Suite 100, Houston, TX 77055.[1] Defendant operates its Food Service Division from this location, through which Defendant imports and/or sells cooler and freezer products, including the Accused Products.[2] Defendant IMBERA USA, LLC additionally operates its Institutional & Micro Market Division through which it imports and/or sells cooler and freezer products, including the Accused Products.[3]

5. Additionally, or alternatively, Defendant has sufficient minimum contacts with the Southern District of Texas such that this venue is fair and reasonable. Defendant has committed such purposeful acts and/or transactions in this District that it reasonably should know and expect that they could be hailed into this Court as a consequence of such activity, including operating its Food Services Division from which it offers to sell and sells the Accused Products. Defendant has transacted and, at the time of the filing of this Complaint, continues to transact business within the Southern District of Texas and maintains a Texas taxpayer number for permitting the same.

6. Further, upon information and belief, Defendant makes or sells products that are and have been used, offered for sale, sold, and/or purchased in the Southern District of Texas. Defendant directly and/or through its distribution network, places infringing products or systems within the stream of commerce, which stream is directed at this District, with the knowledge

---

[1] https://comptroller.texas.gov/taxes/franchise/account-status/search/32038785922, and https://us.imberacooling.com/contact/

[2] https://us.imberacooling.com/foodservice/

[3] https://us.imberacooling.com/institutional/

and/or understanding that those products will be sold and/or used in the Southern District of Texas.

7. For these reasons, personal jurisdiction exists, and venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b), respectively.

## III. THE ASSERTED PATENTS

8. Triteq is the owner of all rights and title in and to U.S. Patent No. 10,612,833 ("the '833 Patent"), U.S. Patent No. 11,668,514 ("the '514 Patent"), U.S. Patent No. 12,392,543 ("the '543 Patent"), and U.S. Patent No. 12,235,034 ("the '034 Patent") by assignment. Collectively, the '833 Patent, the '514 Patent, the '543 Patent, and the '034 Patent are referred to herein as the "Asserted Patents." Each of the Asserted Patents share a common specification and claim priority to the filing of U.S. Provisional Appl. Ser. No. 61/754,332, filed on January 18, 2013.

9. Triteq is a U.S.-based company which develops and makes intelligent electromechanical lock system hardware and software for providing secured access to controlled locations, including locks for selectively allowing or preventing access to vending machines and micro-markets through application of time-, temperature-, and power detection-based protocols. Triteq has become a leading designer, manufacturer, and supplier of intelligent electromechanical lock systems. Triteq products are used by customers across several industries, including by vending machine and micro-market operators.

10. Micro markets are often unattended retail locations where consumers may freely browse and access products on shelves and in temperature-controlled displays, including refrigerators and freezers, for example. Consumers serve themselves and typically pay for their selected items via a self-checkout kiosk. In this unattended environment it is important to

maintain the integrity of perishable food and drink products, and to ensure that patrons do not have access to products that have spoiled due to failure to maintain an appropriate temperature in the merchandiser. Increased temperatures causing spoilage may result from a power failure, failure of the cooling unit, or from a failure to close the merchandiser door for an extended time period, for example.

11. Triteq's Patents disclose and claim vending machines, including freezers and refrigerators, which are usable in micro-markets and other similar applications. Locking mechanisms and methods or algorithms for controlling the same are disclosed and claimed, including within the Asserted Patents. When implemented with the electromechancial lock systems and control methods claimed in the Asserted Patents, these freezers and refrigerators are operable to selectively permit or prevent access to perishable food items stored within in a manner suitable for use in micro-markets or other similar applications to prevent the undesirable sale of spoiled or thawed food products to consumers by detecting and responding to temperature conditions within the freezer or cooler which have the potential to result in thawing or spoilage.

12. Embodiments of an exemplary lock for use to control access to a cabinet of a refrigerated cooler or freezer are shown in Figs. 2-14 of the Asserted Patents. An exemplary lock embodiment may comprise components attached to a cabinet door of a cooler/freezer and to a surface of the cabinet which align such that a strike component is received by a latch and selectively held therein by a movable claw, as best shown in the exemplary embodiment of the Figures excerpted below:




Figs. 8, 12 of Asserted Patents

Briefly, in the embodiment shown, a latch 4 (or claw 7) may rotate to engage strike 3 when the door is closed. The connection of strike 3 into latch 4 (or claw 7) when the door is closed may cause the latch or claw to rotate and capture the strike. The latch or claw may be engaged (selectively locked) or disengaged (selectively unlocked) by an engaging member (or slider) 12 operated by cam 14 and motor 17 and controller 51. An actuator (or motor) 17 may be implemented to position the engaging member to move between a locked and unlocked state. See, generally, '833 Patent at 3:6-56.

13. The particular component arrangement and operation shown in at least these Figures may advantageously improve the alignment of the latch and catch components during operation of a cooler/freezer door. Additionally, the component arrangement permits transitioning to a locked state at times when the freezer or refrigerator door is open without undesirably preventing subsequent closing of the door, at which point the door will be held in a closed state.

14. In an embodiment, a lock may comprise one or more controllers, processors, and/or sensor components used to control operation of the lock. The controller and/or processor may be configured to execute certain control logic for preventing access to food stored within the

cooler/freezer upon detection of certain conditions. For example, in an embodiment, sensors may by implemented that are operable to detect one or more of the interior temperature in refrigerated cabinet; the rate of temperature change inside refrigerated cabinet; elapsed time since the occurrence of an event; the power status (A/C or battery) of the cooler/freezer; the door and lock states (open/closed or locked/unlocked); and, input from a user (fob detection, e.g.); among others.

15. Control logic and algorithms for determining when locking or unlocking of the lock mounted to a cooler/freezer may be implemented to prevent access to food items which may have become spoiled due to prolonged storage at above safe temperatures. An exemplary control logic for a refrigerator application may follow the algorithm shown below. In freezer embodiments, the control logic may be similarly configured, with temperature thresholds set to lower temperatures to avoid thawing as well as spoilage.




FIG. 15

16. According to the embodiment shown, control logic may detect a "power on" condition at which point the lock is placed in an "unlocked" state and the internal temperature is monitored and compared to a configurable threshold temperature. Upon reaching this first threshold temperature, the lock may remain in an unlocked state while the processor monitors the one or more door state and/or temperature characteristics to determine if the cooler/freezer is in

"service mode," meaning the door is being held open for restocking, maintenance, or the like. In "service mode," the processor may remain in an unlocked state for a predetermined period of time before resuming normal operation or determining that the cooler freezer remains in "service mode."

17. Normal operation may comprise continuous monitoring for over-temperature conditions within the freezer or refrigerator, which may result from power loss, equipment failure, the cabinet door not closing, or other event. The lock system may then monitor this detected condition and measure the length of time that it persists before returning to at or below the threshold temperature (which may be configured to be approximately 42F in refrigerators or 0F in freezers, for example). If the over-temperature condition persists for greater than a defined period of time, the lock system may transition to a "locked" state to prevent further access to potentially thawed or spoiled food products.

18. Once locked, the lock system may maintain that state until a "reset" condition is detected. The locked state may be maintained until electronically reset via input received by the controller, such as a reset code, for example. In response, the controller may signal an actuator component in the lock system to disengage from the locked position and resume normal monitoring operations.

19. While in the locked state, the interior of the cabinet be temporarily accessible without placing the lock system in the unlocked state via use of a secured unlocking implement or an unsecured unlocking implement. In an embodiment, the secured unlocking implement may externally accessible and comprise use of keyed access, entry of a temporary access code to the controller, or the like. The unsecured implement may comprise a release latch disposed within the cabinet of the freezer or refrigerator, or similar mechanism. Such implements may

mechanically disengage one or more lock components to permit temporary access to the interior of the cabinet without disturbing the locked state of the controller.

20. The lock system may be electrically coupled to an external, primary power supply, such as the A/C power supply from a wall outlet that also powers the air conditioning components of the freezer or refrigerator. Additionally, the lock system may be electrically coupled to an independent power supply, such as one or more batteries. In an embodiment, the lock system may operate under the primary power supply and transition to battery power upon interruption of primary power to the freezer or cooler. Advantageously, use of the backup battery supply may avoid nuisance locking in response to a temporary interruption to primary power of short duration or that is fixed prior to the occurrence of a fault event.

21. The locks disclosed and claimed in the Asserted Patents may be implemented on a cooler/freezer, as shown below:




Fig. 1A of Asserted Patents

22. Triteq makes and sells locks for vending machines that practice one or more claims of the Asserted Patents, including its Fresh IQ 2100 and 2200 Health Timer Locks for single and double door applications, respectively. The Fresh IQ Health Timer locks are compatible for use with coolers and freezers made by many leading manufacturers.

23. Triteq's Fresh IQ Health Timer locks, along with the refrigerators and freezers utilizing them, practice claims within one or more of the many validly issued U.S. patents assigned to Triteq, including the Asserted Patents. Triteq virtually marks its products in compliance with 35 U.S.C. §287 at least at both of its FreshIQLock.com and TriteqLock.com websites from which its Fresh IQ Health Timer locks may be purchased.

## IV. THE ACCUSED PRODUCTS

24. Imbera is a manufacturer of freezer and refrigerator merchandisers operable as vending machines and/or as micro-markets. Imbera makes, sells, offers for sale, and imports into the United States its cooler and freezer merchandisers, including the Accused Products.

25. The Accused Products of Imbera include its "Insight Health Lock," which is marketed as an "electronic health lock system," and cooler and freezer merchandisers implemented with the Insight Health Lock. Such cooler and freezer merchandisers include at least versions of the following models implemented with the Insight Health Lock: G319 coolers; VR12 coolers; VR27 coolers; VFS12 freezers; VFS24 freezers; LTF23 freezers; VRF26 dual cooler/freezers; and, VRFD22 dual cooler/freezers.[4]

26. The Accused Products comprise a wireless controller, an electro-mechanical lock, a refrigeration system, sensors for detecting temperatures and door position, AC power connector, backup battery, control switches, and status indicators.

27. The Accused Products comprise commercial refrigerators and freezers used to vend refrigerated and/or frozen food products. Each Accused Product comprises a closed cabinet forming a refrigerated storage volume that is accessible via a glass door. Food products are stored on interior shelves. Consumers open the door to access and remove desired products. The Accused Products are implemented with the Insight Health Lock that operates to "ensure[] door will lock if $T_{MAX}$ temperature & timers are exceeded" and when primary power is interrupted, as detailed in Insight product literature:

[4] https://us.imberacooling.com/options-available-by-request/



Imbera's new heath lock system helps ensure optimal food safety at the point-of-purchase, by preventing access to food that is potentially not safe to consume. Our new communications enabled controller allows operators to remotely monitor refrigeration temperature and manage locking events.

**INSIGHT LOCK TEMPERATURE & TIMER OPERATING PARAMETERS**

| INSIGHT LOCK Operating Logic | NAMA T.MAX Temperature | NAMA Timer STD | INSIGHT Total Timer | Refrigeration Cut-In Temp | Refrigeration Cut-Out Temp |
|---|---|---|---|---|---|
| COOLER G319 | 41°F (5°C) | 30 mins | 195 mins | 44.6°F (7°C) | 32°F (0°C) |
| FREEZER VFS24 | 0°F (-18°C) | 75 mins | 240 mins | 0.4°F (-18°C) | -5.8°F (-18°C) |

Exh. E (Insight Spec Sheet) at 2 (annotation added).

28. The Accused Products comprise a refrigeration system for providing refrigerated air throughout the internal cabinet. In cooler applications, the refrigeration system cycles on upon sensing an internal temperature of 44.6°F (7°C) to cool the internal cabinet temperature to below 41°F (5°C). In freezer applications, the refrigeration system cycles on upon sensing an internal temperature of 0.4°F (-18°C) to cool the internal cabinet temperature to below -3°F (-18°C). *See,* Exhs. E, G.

29. Operation of the refrigeration system components is controlled by an Intelligent Refrigeration Controller – Softel's CIR Wireless 2V1 TJ000190. Exh. G at 2. The compressor, defrost and evaporator-fan line outputs are switched by CIR connector P5 (pins B, C, D), with line and neutral inputs on pins A and E.

30. The Accused Products comprise an electromechanical lock for selectively securing the door to the cabinet to prevent consumer access to products stored therein. The lock used is the Southco R4-EM-R73-161 electronic rotary latch lock mounted on the side of the cabinet, external to the refrigerated storage volume. Exh. E at 2; Exh. G at 4. Southco describes

this series of lock to operate under "microprocessor control" with "embedded electronic control [that] allows integration with an external control system." *See,* Exh. I at 1.

31. The Southco part number signifies the following characteristics: delayed re-locking with rear trigger and light spring [R7]; 7mm diameter thru-hole mounting [3]; non-sealed connector [1]; and, internal latch status switch [6]. Exh. I. The lock architecture includes a housing, steel cam ("latch"), steel springs, and an electronic actuator assembly comprising a PC/ABS housing, silicone bellows and wire seal, Buna perimeter seal, acetal cams, TPE grommet:




CAD representation of internal components for R4-EM-R73-161 lock [5]

32. As installed on the Accused Products, the lock housing and actuator assembly shown above is externally mounted to the side wall of the Accused Products:

---

[5] https://southco.com/en_us_int/partstream/model/view/sku/R4-EM-73-161/?_gl=1*9sau4i*_up*MQ..*_ga*MTQ0NjE5OTk2NS4xNzg5NTAyMDUw*_ga_BMN2PED7E6*czE3ODk1MDIwNTAkbzEkZzAkdDE3ODk1MDIwNTAkajYwJGwwJGgw



Exh. E at 1.

A striker component ("catch") is mounted on the door and aligned to enter the opening in the cabinet-mounted lock mechanism and contact the cam. Pushing the door closed forces the striker ("catch") into a recessed opening of the wall-mounted lock housing, whereby the "striker will rotate cam to closed position." A cam spring pulls the cam ("latch") back to its open when the striker withdraws while the lock is in its 'unlocked' state. The latch is therefore in the latched position when the door is closed and the unlatched position when the door is open.

33. In operation, the steel cam ("latch") rotates between an 'open' and a 'closed' position. When closed, the steel cam ("latch") encloses and traps a catch component mounted to the door of the Accused Products. To maintain the Accused Products in the "locked" state whereby the door cannot be opened, the internal cam is positioned using the electronic actuator to engage and block the steel cam ("latch") to prevent it from moving from its 'closed' position

to its ‘open’ position. Extending the internal cam places it in its ‘locked’ state, while retracting the internal cam places it in its ‘unlocked’ state.

34. The Southco lock requires and operating voltage of 12–24 VDC. Power is required to position the internal cam and hold it in its retracted position to allow for opening of the cabinet door. A control signal high (12–24 V) for ≥50 ms triggers unlocking while a control signal low (0–1 V) for 50 ms triggers locking. Power must be available to cause and complete transition to the locked position.

35. The Accused Products comprise a Softel CIR Wireless 2V1 controller (Imbera P/N 3056238). The CIR controller controls cooling and commands the Insight lock to its locked or unlocked state, as appropriate to prevent access to stored food products that may be thawed or spoiled from overtemperature conditions. The CIR sends alerts over WiFi to users regarding lock status and other information. Exhs. G, H.

36. The Softel CIR mobile application, Imbera’s Market Safe portal, and FOB devices are usable to send and receive information and commands to monitor and control operation of the Accused Products. Exhs. G, H.

37. The CIR Wireless controller comprises a 32-bit microcontroller core, 32 kB RAM, and 256 kB flash memory. It is powered by 12 VDC supply (P2/P3) derived from AC line input at P5.




Annotated image of CIR Wireless Controller showing connections

38. The CIR Wireless controller received temperature data from three probes via connector P4 measuring internal air, external, and condenser temperatures. CIR Wireless controller monitors the door position using door switch connected via P7. Door lock on/off control commands are communicated via P8.

39. The CIR Wireless controller is implemented with Bluetooth and WiFi communications components, including a BLE 4.2 PCB antenna with 30m range and a WiFi 802.11 b/g/n 2.4 GHz transmitter. Each is used to report information and alarms, and to receive commands to control operation of the Accused Products, to include remote locking, unlocking, and/or resetting detected faults and alarms of the Insight Health Lock. Exhs. E, G, H.

40. The Accused Products operate using AC line power via a plug connection. The Accused Products additionally comprise a 9V backup battery designed for two years of use. Exh. G. Upon loss of primary power, battery supplied backup power is used to transition the

electromechanical lock to its locked position two minutes after loss of primary power. Backup battery power is used to continue monitoring cabinet temperatures during the power outage.

41. During normal operation, with the Insight Health Lock functionality switched ON and while AC line power is received, the CIR will maintain the Southco lock in its unlocked state to permit free access to the internal storage cabinet by customers. Exhs. E, G. The CIR continuously monitors and logs the sensed temperatures from three temperature probes, to include a thermal-mass-surrounded probe positioned inside the cooled internal storage cabinet. Sensed temperatures are logged every 10 minutes along with door open/close events and transmitted to operators using Imbera's Market Safe portal and mobile application over WiFi.

42. Upon detection of an internal temperature exceeding $T_{MAX}$, the CIR starts a timer. The CIR will command transition to the "locked" state if the overtemperature condition persists for longer than a permitted time period. The NAMA standard time period for cooler applications is 30 minutes over temperature before locking. For freezers, the NAMA standard time period is 75 minutes over temperature before locking. The Accused Products will extend this period in staged increments of +45 minutes, +60 minutes, and +60 minutes without transitioning to the locked state so long as the temperature inside the cabinet is cooling back toward below $T_{MAX}$. The total extendable time before locking is 195 minutes for coolers and 240 minutes for freezers. If the temperature returns to below $T_{MAX}$ within the allotted time, the timer clears. Exh. G.

43. If at the close of a time period, the overtemperature condition persists and the internal temperature is not cooling down towards $T_{MAX}$, the CIR sends a low signal to the lock assembly. In response, the lock assembly causes the actuator to transition to its locked state by extending internal cam to trap the latch in its closed position. Likewise, if the overtemperature

condition remains after all staged extensions have elapsed, the CIR will signal the lock assembly to transition to its locked state. When locked, a red LED on the front grill illuminates.

44. Loss of primary AC power will also result in transition to the locked state after two minutes have elapsed without power. This occurs regardless of the cabinet temperature. Because the Southco mechanism requires powered motor transit to reach the locked position, the two-minute delayed lock necessarily proceeds on stored/battery power. When AC returns, the cabinet unlocks automatically provided $T_{MAX}$ was not exceeded during the power interruption. Exh. E.

45. The Accused Products may be commanded to their locked or unlocked states via electronic signaling. Each lock carries a unique SOFTEL IP code, labeled inside the cabinet next to the Imbera serial label, which is used to associate operators with their merchandiser units for authorizing lock and unlock commands.

46. The Softel CIR App installed on an operator's smart device can be used to send lock and unlock signals, as desired, via Bluetooth communication to the CIR. This will cause the CIR to send the appropriate signal to the lock controller circuitry to configure the lock components.

47. A Softel Bluetooth FOB can be used in this same manner to signal the CIR to command locking or unlocking, as desired.

48. The CIR may be signaled to lock or unlock the Insight Health Lock over WiFi using Imbera's Market Safe portal on an operator's computing device. Exh. H. The command then "executes immediately on the refrigerator, via Wi-Fi" and Market Safe retains a command history.

49. Mechanical means for temporarily permitting access to the internal storage area of the Accused Products are also provided. Mechanical unlocking does not cause the CIR to reset the state of the Accused Products to normal, unlocked operation following a locking event, however. Exh. G.

50. The Accused Products are implemented with an unlock button that is disposed behind the front grill external to the storage area. Pressing this button acts on lock directly and "temporarily unlocks cabinet, during power outages, for servicing function, as the APP & FOB cannot operate without power supply." Exh. G.

51. The Accused Products are also implemented with an emergency internal release located inside the storage area. The emergency release is used "if for any reason, someone is trapped inside the unit, they can simply press the unlock button and push door open." Exh. G.

52. Upon information and belief, Imbera provides instructions to its customers and users of the Accused Products demonstrating how to install, set up, and use the Accused Products in the form of, at least, user manuals, product specifications, and technical bulletins available through Imbera's website and/or YouTube channel.[6] Exhs. E, G, H. These resources provide instructions directed to operators and end users of the Accused Products demonstrating use thereof in manners that infringe the Asserted Patent(s). Use of the Accused Products in accordance with these instructions constitutes direct infringement of the Asserted Patent by end users of the Accused Products.

53. Imbera has had actual knowledge of Triteq's Patents, including the Asserted Patents and/or applications that would issue as the Asserted Patents, via interactions among the

[6] See, e.g., https://www.youtube.com/watch?v=ZUazZ566Ae0

parties dating back to, at least, the release of Imbera's "Performax" branded merchandiser products on or around July 2015, if not earlier.

54. Prior to its commencement of making, selling, using, and/or importing the Accused Products, Imbera was a customer of Triteq. Imbera's predecessor "Performax" branded merchandisers comprised an Imbera G319 cooler implemented with Triteq's Fresh IQ 2100 Health Timer Lock. Imbera began purchasing the Fresh IQ 2100 lock in 2019. As implemented on Imbera merchandisers, the Fresh IQ 2100 was configured for use with Triteq's AutoTraq remote monitoring and control portal.

55. Prior to its purchases of the Fresh IQ 2100 locks, Imbera purchased Triteq's CL100 lock for implementation with Imbera merchandisers. Imbera's use of the predecessor CL100 locks began in 2014.

56. Product documentation for the G319 Performax 15 product describes Triteq as a "leader[] in intelligent freezer and vending security solutions."




Exh. F (G319 Perfromax 15 product brochure) at 3.

57. The Accused Products were developed to replace the Triteq lock and associated hardware and controls used with the Performax products. Imbera's product tutorials and product literature affirm that the "Insight Lock functions exactly the same as the Performax [] lock did" and "[m]aintains same control logic & timers."[7] Imbera developed the Insight lock as a replacement for Triteq's FreshIQ lock, and did so with knowledge of Triteq's patent rights covering the FreshIQ products and despite not having obtained a license or authority to make and sell infringing lock products from Triteq.

58. In addition to direct communications between the parties, Imbera has actual knowledge of Triteq's patents, including the Asserted Patents, from Triteq marking its Fresh IQ

[7] *See,* https://www.youtube.com/watch?v=ZUazZ566Ae0 at 0:15; Exh. E (Insight Health Lock brochure).

2100 Health Timer Locks pursuant to 35 USC §287 to identify its patents, including the Asserted Patents, on Triteq's website and in product literature for its Fresh IQ 2100 and FreshTraq products.[8]

59. Additionally, Imbera has been aware of Triteq's patents since at least April 22, 2020. On that date, TriTeq issued a press release on "Vending Market Watch," an industry website for the food service industry identifying its issued U.S. Patents and patented products. This identification included the '833 Patent.[9]

60. Triteq and Imbera are direct competitors. Triteq makes and sells locks practicing claims of the Asserted Patents that are designed to be, and have been, implemented with Imbera cooler and freezer merchandisers. Prior to Imbera's making and selling of its Insight lock, Imbera used Triteq locks and associated products and services with its "Performax" brand merchandisers. Imbera discontinued its sales of Performax products and associated purchases of Triteq locks, accessories, and remote monitoring and control services upon its development of the infringing Insight lock.

**COUNT I**
**PATENT INFRINGEMENT**
**U.S. Patent No. 10,612,833 B2**

61. Triteq repeats and re-alleges all preceding paragraphs of this Complaint, including those describing the features and operation of the Accused Products, as though fully set forth herein.

---

[8] https://freshiqlock.com/product/freshiq-series-2100-health-timer-lock-kit

[9] https://www.vendingmarketwatch.com/equipment/security-systems-and-locks/news/21135122/triteq-lock-and-security-issued-five-novel-us-patents?utm_source=AUTM+VMW+Today+NL&utm_medium=email&utm_campaign=AUTM200422003&o_eid=6334A9820412D9Z&rdx.ident%5Bpull%5D=omeda%7C6334A9820412D9Z&oly_enc_id=6334A9820412D9Z

62. On April 17, 2020, United States Patent No. 10,612,833 B2 ("the '833 Patent") was duly and legally issued which disclosed and claimed "Cooler Lock" systems and methods of use. As of the filing of this Complaint, the '833 Patent remains in force. A true and correct copy of the '833 Patent is attached hereto as Exhibit A and made a part hereof.

63. Triteq is the owner of all right and title in the '833 Patent, including all rights to enforce and prosecute action for infringement of the '833 Patent and to collect damages for all relevant times against infringers of the '833 Patent. Accordingly, Triteq possesses the exclusive right and standing to prosecute the present action for infringement of the '833 Patent by Imbera.

64. The '833 Patent generally discloses and claims electromechanical lock systems and methods for operating the same comprising a locking mechanism, a controller, and one or more temperature sensors for use in connection with vending machines and/or micro-markets. The systems and methods claimed accommodate selective locking and unlocking of an electromechanical lock for the purpose of securing the vending machine cabinet to prevent unauthorized access and, more importantly, access by customers following detection of certain triggering events which may cause or lead to the thawing or spoiling of food items stored in the vending machine. Triggering events may be based upon sensed temperature(s) of air in the vending machine, temperature changes, or rates of temperature change, among others.

65. In certain embodiments, the lock system claimed is electrically coupled with a primary power supply powering the refrigerator or freezer to which the lock system is affixed, as well as a battery backup power supply. In this arrangement, the lock system may accommodate continued monitoring of conditions within the refrigerator or freezer even during an interruption of primary power. Further, in certain embodiments, the lock system may be configured to work in conjunction with an externally accessible, keyed entry mechanism permitting temporary

access to the cabinet while the controller maintains the electromechanical lock in a locked state. Temporary access to the cabinet without disturbing the electromechanical locked state may be permitted via use of an internally disposed "entrapment" release. In operation, these means for temporary access to the cabinet mechanically disengage the lock to permit opening of the cabinet door without returning the lock system to the electromechanical unlocked state.

66. Imbera, without authority, consent, right, or license, and in direct infringement of the '833 Patent, makes, has made, uses, sells, offers for sale, and/or imports into the United States the Accused Products, which comprise the components and functionality described above, and which infringe at least claim 14 of the '833 Patent, among others. In addition, Imbera's quality testing and demonstrations of operation of the Accused Products on its refrigerators and freezers constitute direct infringement, either literally or under the doctrine of equivalents, of at least claim 14 of the '833 Patent.

67. Additionally, or alternatively, Imbera actively induces infringement of one or more of the claims of the '833 Patent by its customers and end users of at least the Accused Products and is therefore liable for indirect infringement under 35 U.S.C. § 271(b). Customers use the Accused Products to effect selective access to, or to secure, vending machine and/or micro-market merchandisers in the manners described above, which directly infringes at least claim 14 of the '833 Patent.

68. Imbera knows that the Accused Products are especially designed for and marketed toward infringing use by its customers, to implement electromechanical locking hardware and controls used in connection with vending machines and/or micro-market merchandisers for selling perishable (and/or frozen) food products. Imbera has induced, caused, urged, encouraged,

aided and abetted its direct and indirect customers to make, use, sell, offer for sale and/or import one or more of the Accused Products.

69. Additionally, Imbera provides step-by-step instructions for installation, setup, and use of the Accused Products to operate in a manner that directly infringes, either literally or under the doctrine of equivalents, at least claim 14 of the ‘833 Patent. These instructions are provided by Imbera as user manuals and online content made available by Imbera through its website to its customers and distributors. Such conduct by Imbera was intended to and actually did result in direct infringement by Imbera’s direct and indirect customers, including the making, using, selling, offering for sale and/or importation of the Accused Products in the United States.

70. Imbera contributes to the infringement of at least claim 14 of the ‘833 Patent by its customers and end users of at least the Accused Products and is therefore liable for indirect infringement under 35 U.S.C. § 271(c). The Accused Products are especially designed to provide selective access to, or to secure, its vending machine and/or micro-market merchandisers in the manners described above infringes at least claim 14 of the ‘833 Patent.

71. Upon information and belief, the Accused Products have no substantial non-infringing use, as they are specifically designed and marketed for use by vending machine and/or micro-market operators to implement electromechanical locking hardware and controls used in connection with vending machines and/or micro-markets selling food products to at least prevent access to food products upon detection of a triggering event. Setup and use of the Accused Products by Imbera’s customers constitutes direct infringement, either literally or under the doctrine of equivalents, of at least claim 14 of the ‘833 Patent.

72. Triteq expressly reserves the right to assert additional claims of the ‘833 Patent against Imbera.

73. Triteq has been damaged as a result of Imbera's infringing conduct. Imbera is, thus, liable to Triteq in an amount that adequately compensates for their infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284. Triteq has also been damaged by the loss of opportunities to make follow-on sales resulting from Imbera's infringing conduct, including lost sales of key fobs, remote monitoring services, and subscription fees, among other ongoing revenue opportunities. Triteq is entitled to further compensation to account for such lost opportunities.

74. Based on Imbera's actual knowledge of the '833 Patent and of Triteq's allegations of patent infringement presented herein since April 22, 2020, if not earlier, as well as Imbera's objective recklessness in continuing to offer for sale and selling the Accused Products since that time, Imbera's infringement has been willful and entitling Triteq to enhanced damages under 35 U.S.C. § 284.

**COUNT II**
**PATENT INFRINGEMENT**
**U.S. Patent No. 11,668,514 B2**

75. Triteq repeats and re-alleges all preceding paragraphs of this Complaint, including those describing the features and operation of the Accused Products, as though fully set forth herein.

76. On June 6, 2023, United States Patent No. 11,668,514 B2 ("the '514 Patent") was duly and legally issued which disclosed and claimed "Cooler Lock" systems and methods of use. As of the filing of this Complaint, the '514 Patent remains in force. A true and correct copy of the '514 Patent is attached hereto as Exhibit B and made a part hereof.

77. Triteq is the owner of all right and title in the '514 Patent, including all rights to enforce and prosecute action for infringement of the '514 Patent and to collect damages for all

relevant times against infringers of the ‘514 Patent. Accordingly, Triteq possesses the exclusive right and standing to prosecute the present action for infringement of the ‘514 Patent by Imbera.

78. The ‘514 Patent generally discloses and claims electromechanical lock systems and methods for operating the same. According to certain claimed embodiments, a refrigerated vending cabinet may comprise an air conditioning unit delivering refrigerated air throughout the enclosed storage area to prevent thawing or spoiling that would occur if the enclosed storage area remained above an elevated air temperature limit. The refrigerated vending cabinet may comprise a locking element on either the body or the door, a locking mechanism mounted on whichever of the two carries the element, and a controller that both operates the system and communicates its parameters.

79. In a claimed embodiment, the controller may run in two modes. In normal operation the lock stays unlocked to permit access to stored food products. The lock may remain unlocked even when the internal temperature becomes elevated, so long as the temperature is falling back toward the proper level. The controller watches for an event that changes the temperature in a way requiring the cabinet to be locked, and on detecting one it switches to the fault condition and drives the lock closed — but only after the temperature has exceeded and then remained above the elevated limit for a minute or more. An unlocking device can release the lock afterward, and the controller reports either the fault condition or the storage-area temperature out to a local or wide area network.

80. Imbera, without authority, consent, right, or license, and in direct infringement of the ‘514 Patent, makes, has made, uses, sells, offers for sale, and/or imports into the United States the Accused Products, which comprise the components and functionality described above, and which infringe at least claim 11 of the ‘514 Patent, among others. In addition, Imbera’s

quality testing and demonstrations of operation of the Accused Products on its refrigerators and freezers constitute direct infringement, either literally or under the doctrine of equivalents, of at least claim 11 of the ‘514 Patent.

81. Additionally, or alternatively, Imbera actively induces infringement of one or more of the claims of the ‘514 Patent by its customers and end users of at least the Accused Products and is therefore liable for indirect infringement under 35 U.S.C. § 271(b). Customers use the Accused Products to effect selective access to, or to secure, vending machine and/or micro-market merchandisers in the manners described above, which directly infringes at least claim 11 of the ‘514 Patent.

82. Imbera knows that the Accused Products are especially designed for and marketed toward infringing use by its customers, to implement electromechanical locking hardware and controls used in connection with vending machines and/or micro-market merchandisers for selling perishable (and/or frozen) food products. Imbera has induced, caused, urged, encouraged, aided and abetted its direct and indirect customers to make, use, sell, offer for sale and/or import one or more of the Accused Products.

83. Additionally, Imbera provides step-by-step instructions for installation, setup, and use of the Accused Products to operate in a manner that directly infringes, either literally or under the doctrine of equivalents, at least claim 11 of the ‘514 Patent. These instructions are provided by Imbera as user manuals and online content made available by Imbera through its website to its customers and distributors. Such conduct by Imbera was intended to and actually did result in direct infringement by Imbera’s direct and indirect customers, including the making, using, selling, offering for sale and/or importation of the Accused Products in the United States.

84. Imbera contributes to the infringement of at least claim 11 of the ‘514 Patent by its customers and end users of at least the Accused Products and is therefore liable for indirect infringement under 35 U.S.C. § 271(c). The Accused Products are especially designed to provide selective access to, or to secure, its vending machine and/or micro-market merchandisers in the manners described above infringes at least claim 11 of the ‘514 Patent. Upon information and belief, the Accused Products have no substantial non-infringing use, as they are specifically designed and marketed for use by vending machine and/or micro-market operators to implement electromechanical locking hardware and controls used in connection with vending machines and/or micro-markets selling food products to at least prevent access to food products upon detection of a triggering event. Setup and use of the Accused Products by Imbera’s customers constitutes direct infringement, either literally or under the doctrine of equivalents, of at least claim 11 of the ‘514 Patent.

85. Triteq expressly reserves the right to assert additional claims of the ‘514 Patent against Imbera.

86. Triteq has been damaged as a result of Imbera’s infringing conduct. Imbera is, thus, liable to Triteq in an amount that adequately compensates for their infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284. Triteq has also been damaged by the loss of opportunities to make follow-on sales resulting from Imbera’s infringing conduct, including lost sales of key fobs, remote monitoring services, and subscription fees, among other ongoing revenue opportunities. Triteq is entitled to further compensation to account for such lost opportunities.

87. Based on Imbera’s actual knowledge of the ‘514 Patent and of Triteq’s allegations of patent infringement presented herein since its issuance, as well as Imbera’s objective

recklessness in continuing to offer for sale and selling the Accused Products since that time, Imbera's infringement has been willful and entitling Triteq to enhanced damages under 35 U.S.C. § 284.

**COUNT III**
**PATENT INFRINGEMENT**
**U.S. Patent No. 12,392,543 B2**

88. Triteq repeats and re-alleges all preceding paragraphs of this Complaint, including those describing the features and operation of the Accused Products, as though fully set forth herein.

89. On August 19, 2025, United States Patent No. 12,392,543 B2 ("the '543 Patent") was duly and legally issued which disclosed and claimed "Cooler Lock" systems and methods of use. As of the filing of this Complaint, the '543 Patent remains in force. A true and correct copy of the '543 Patent is attached hereto as Exhibit C and made a part hereof.

90. Triteq is the owner of all right and title in the '543 Patent, including all rights to enforce and prosecute action for infringement of the '543 Patent and to collect damages for all relevant times against infringers of the '543 Patent. Accordingly, Triteq possesses the exclusive right and standing to prosecute the present action for infringement of the '543 Patent by Imbera.

91. The '543 Patent generally discloses and claims electromechanical lock systems and methods for operating the same. According to certain claimed embodiments, a refrigerated vending cabinet may comprise an air conditioning unit delivering refrigerated air throughout the enclosed storage area to prevent thawing or spoiling that would occur if the enclosed storage area remained above an elevated air temperature limit. The refrigerated vending cabinet may comprise a locking element on either the body or the door, a locking mechanism mounted on

whichever of the two carries the element, and a controller that both operates the system and communicates its parameters.

92. In a claimed embodiment, the controller may run in two modes. In normal operation the lock stays unlocked to permit access to stored food products. The lock may remain unlocked even when the internal temperature becomes elevated, so long as the temperature is falling back toward the proper level. The controller watches for an event that changes the temperature in a way requiring the cabinet to be locked, and on detecting one it switches to the fault condition and drives the lock closed — but only after the temperature has exceeded and then remained above the elevated limit for a minute or more. An unlocking device can release the lock afterward, and the controller reports either the fault condition or the storage-area temperature out to a local or wide area network. A first microcomputer may be configured to communicate a parameter of the access control system, and a second microcomputer may cause actuation of the locking mechanism.

93. Imbera, without authority, consent, right, or license, and in direct infringement of the ‘543 Patent, makes, has made, uses, sells, offers for sale, and/or imports into the United States the Accused Products, which comprise the components and functionality described above, and which infringe at least claim 54 of the ‘543 Patent, among others. In addition, Imbera’s quality testing and demonstrations of operation of the Accused Products on its refrigerators and freezers constitute direct infringement, either literally or under the doctrine of equivalents, of at least claim 54 of the ‘543 Patent.

94. Additionally, or alternatively, Imbera actively induces infringement of one or more of the claims of the ‘543 Patent by its customers and end users of at least the Accused Products and is therefore liable for indirect infringement under 35 U.S.C. § 271(b). Customers

use the Accused Products to effect selective access to, or to secure, vending machine and/or micro-market merchandisers in the manners described above, which directly infringes at least claim 54 of the ‘543 Patent.

95. Imbera knows that the Accused Products are especially designed for and marketed toward infringing use by its customers, to implement electromechanical locking hardware and controls used in connection with vending machines and/or micro-market merchandisers for selling perishable (and/or frozen) food products. Imbera has induced, caused, urged, encouraged, aided and abetted its direct and indirect customers to make, use, sell, offer for sale and/or import one or more of the Accused Products.

96. Additionally, Imbera provides step-by-step instructions for installation, setup, and use of the Accused Products to operate in a manner that directly infringes, either literally or under the doctrine of equivalents, at least claim 54 of the ‘543 Patent. These instructions are provided by Imbera as user manuals and online content made available by Imbera through its website to its customers and distributors. Such conduct by Imbera was intended to and actually did result in direct infringement by Imbera’s direct and indirect customers, including the making, using, selling, offering for sale and/or importation of the Accused Products in the United States.

97. Imbera contributes to the infringement of at least claim 54 of the ‘543 Patent by its customers and end users of at least the Accused Products and is therefore liable for indirect infringement under 35 U.S.C. § 271(c). The Accused Products are especially designed to provide selective access to, or to secure, its vending machine and/or micro-market merchandisers in the manners described above infringes at least claim 54 of the ‘543 Patent. Upon information and belief, the Accused Products have no substantial non-infringing use, as they are specifically designed and marketed for use by vending machine and/or micro-market operators to implement

electromechanical locking hardware and controls used in connection with vending machines and/or micro-markets selling food products to at least prevent access to food products upon detection of a triggering event. Setup and use of the Accused Products by Imbera's customers constitutes direct infringement, either literally or under the doctrine of equivalents, of at least claim 54 of the '543 Patent.

98. Triteq expressly reserves the right to assert additional claims of the '543 Patent against Imbera.

99. Triteq has been damaged as a result of Imbera's infringing conduct. Imbera is, thus, liable to Triteq in an amount that adequately compensates for their infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284. Triteq has also been damaged by the loss of opportunities to make follow-on sales resulting from Imbera's infringing conduct, including lost sales of key fobs, remote monitoring services, and subscription fees, among other ongoing revenue opportunities. Triteq is entitled to further compensation to account for such lost opportunities.

100. Based on Imbera's actual knowledge of the '543 Patent and of Triteq's allegations of patent infringement presented herein since its issuance, as well as Imbera's objective recklessness in continuing to offer for sale and selling the Accused Products since that time, Imbera's infringement has been willful and entitling Triteq to enhanced damages under 35 U.S.C. § 284.

**COUNT IV**
**PATENT INFRINGEMENT**
**U.S. Patent No. 12,235,034 B2**

101. Triteq repeats and re-alleges all preceding paragraphs of this Complaint, including those describing the features and operation of the Accused Products, as though fully set forth herein.

102. On February 25, 2025, United States Patent No. 12,235,034 B2 ("the '034 Patent") was duly and legally issued which disclosed and claimed "Vending Lock" systems and methods of use. As of the filing of this Complaint, the '034 Patent remains in force. A true and correct copy of the '034 Patent is attached hereto as Exhibit D and made a part hereof.

103. Triteq is the owner of all right and title in the '034 Patent, including all rights to enforce and prosecute action for infringement of the '034 Patent and to collect damages for all relevant times against infringers of the '034 Patent. Accordingly, Triteq possesses the exclusive right and standing to prosecute the present action for infringement of the '034 Patent by Imbera.

104. The '034 Patent generally discloses and claims enclosure access control systems. According to one claimed embodiment, an enclosure access control system may be operable to lock an enclosure during a power failure or fault event. The enclosure has a body and a door defining a product storage area holding products a consumer can select while the door is open. A locking mechanism is disposed on the enclosure body with an opening and a latch while a corresponding locking element is disposed on the door. The latch moves between a latched and an unlatched position, defined by contact: unlatched when the element is not touching it and the door is open, latched when the element is touching it and the door is closed. The mechanism also carries an electronically-actuated latch engaging member that selectively engages the latch to lock it in the latched position, and lock controller circuitry that controls the member's movement

and selectively provides a lock actuation signal to the mechanism. An AC power source powers the lock controller circuitry during normal operation, and a battery supplies it so that the circuitry can lock the door in response to one of a power failure and a fault event.

105. Imbera, without authority, consent, right, or license, and in direct infringement of the ‘034 Patent, makes, has made, uses, sells, offers for sale, and/or imports into the United States the Accused Products, which comprise the components and functionality described above, and which infringe at least claim 2 of the ‘034 Patent, among others. In addition, Imbera’s quality testing and demonstrations of operation of the Accused Products on its refrigerators and freezers constitute direct infringement, either literally or under the doctrine of equivalents, of at least claim 2 of the ‘034 Patent.

106. Additionally, or alternatively, Imbera actively induces infringement of one or more of the claims of the ‘034 Patent by its customers and end users of at least the Accused Products and is therefore liable for indirect infringement under 35 U.S.C. § 271(b). Customers use the Accused Products to effect selective access to, or to secure, vending machine and/or micro-market merchandisers in the manners described above, which directly infringes at least claim 2 of the ‘034 Patent.

107. Imbera knows that the Accused Products are especially designed for and marketed toward infringing use by its customers, to implement electromechanical locking hardware and controls used in connection with vending machines and/or micro-market merchandisers for selling perishable (and/or frozen) food products. Imbera has induced, caused, urged, encouraged, aided and abetted its direct and indirect customers to make, use, sell, offer for sale and/or import one or more of the Accused Products.

108. Additionally, Imbera provides step-by-step instructions for installation, setup, and use of the Accused Products to operate in a manner that directly infringes, either literally or under the doctrine of equivalents, at least claim 2 of the '034 Patent. These instructions are provided by Imbera as user manuals and online content made available by Imbera through its website to its customers and distributors. Such conduct by Imbera was intended to and actually did result in direct infringement by Imbera's direct and indirect customers, including the making, using, selling, offering for sale and/or importation of the Accused Products in the United States.

109. Imbera contributes to the infringement of at least claim 2 of the '034 Patent by its customers and end users of at least the Accused Products and is therefore liable for indirect infringement under 35 U.S.C. § 271(c). The Accused Products are especially designed to provide selective access to, or to secure, its vending machine and/or micro-market merchandisers in the manners described above infringes at least claim 2 of the '034 Patent. Upon information and belief, the Accused Products have no substantial non-infringing use, as they are specifically designed and marketed for use by vending machine and/or micro-market operators to implement electromechanical locking hardware and controls used in connection with vending machines and/or micro-markets selling food products to at least prevent access to food products upon detection of a triggering event. Setup and use of the Accused Products by Imbera's customers constitutes direct infringement, either literally or under the doctrine of equivalents, of at least claim 2 of the '034 Patent.

110. Triteq expressly reserves the right to assert additional claims of the '034 Patent against Imbera.

111. Triteq has been damaged as a result of Imbera's infringing conduct. Imbera is, thus, liable to Triteq in an amount that adequately compensates for their infringement, which, by

law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284. Triteq has also been damaged by the loss of opportunities to make follow-on sales resulting from Imbera's infringing conduct, including lost sales of key fobs, remote monitoring services, and subscription fees, among other ongoing revenue opportunities. Triteq is entitled to further compensation to account for such lost opportunities.

112. Based on Imbera's actual knowledge of the '034 Patent and of Triteq's allegations of patent infringement presented herein since issuance of the '034 Patent, as well as Imbera's objective recklessness in continuing to offer for sale and selling the Accused Products since that time, Imbera's infringement has been willful and entitling Triteq to enhanced damages under 35 U.S.C. § 284.

## VI. JURY DEMAND

113. Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a. Judgment that one or more claims of the Asserted Patents have been directly infringed, either literally or under the doctrine of equivalents, by Defendant, or judgment that one or more of the claims of the Asserted Patents have been directly infringed by others and indirectly infringed by Defendant, to the extent Defendant contributed to or induced such direct infringement by others;

b. Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other

conduct complained of herein, including enhanced damages as permitted by 35 U.S.C. § 284;

c. Judgement that Defendant's infringement is willful from the time Defendant was made aware of the infringing nature of its products and methods and that the Court award treble damages for the period of such willful infringement pursuant to 35 U.S.C. § 284;

d. That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein;

e. That the Court declare this an exceptional case and award Plaintiff its reasonable attorney's fees and costs in accordance with 35 U.S.C. § 285; and

f. That Defendant, its officers, agents, servants and employees, and those persons in active concert and participation with any of them, be permanently enjoined from infringement of one or more claims of the Asserted Patents or, in the alternative, if the Court finds that an injunction is not warranted, Plaintiff requests an award of post judgment royalty to compensate for future infringement;

g. That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

Respectfully submitted,

*s/ Jonathan T. Suder*
Jonathan T. Suder
Richard A. Wojcio, Jr.
FRIEDMAN, SUDER & COOKE
604 East 4th Street, Suite 200
Fort Worth, TX 76102
817-334-0400
Fax: 817-334-0401
jts@fsclaw.com
wojcio@fsclaw.com

*Attorneys for Triteq Lock & Security, LLC*